UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - FLINT

IN RE:

    WILLIAM C. WARPUP                                           Case No. 10-35520-dof
    and LORI J. WARPUP,                                Chapter 7 Proceeding
            Debtors.                                              Hon. Daniel S. Opperman
_____/

CARMEN BAKDALEYEH
and MOHAMMAD BAKDALEYEH,

    Plaintiffs,

v.                                                                   Adversary Proceeding
                                                                    Case No. 11-3041-dof

WILLIAM C. WARPUP
and LORI J. WARPUP,

    Defendants.
_____/

## Trial Opinion

The Plaintiffs, Carmen and Mohammad Bakdaleyeh, seek to have the debt owed to them by the Defendants, William and Lori Warpup, excepted from discharge pursuant to 11 U.S.C. § 523(a)(4) because the Plaintiffs claim the Defendants violated the Michigan Builders Trust Fund Act ("MBTFA"). The Defendants deny that the Plaintiffs are entitled to this determination. The Court conducted a Trial of this adversary proceeding on May 28, 2013, and July 1, 2013, and heard the testimony of Brett Bonaventure, Plaintiff, Carmen Bakdaleyeh, and Defendants, William and Lori Warpup. The Court also admitted Exhibits A, E, F, I, K, 3(c), 3(d), 3(f), 4, 6, 8, 9, 13, 20, and 21. The closing arguments were heard on August 5, 2013, and the Court took this matter under advisement. The Court makes the following findings of fact from the testimony and admitted evidence. For the reasons stated in this Opinion, the Court holds that the Plaintiffs have failed to

1

state a cause of action against the Defendant, Lori Warpup, but that the amount of $58,867.10 owed to the Plaintiffs by the Defendant, William Warpup, is excepted from discharge.

Findings of Fact

The Plaintiffs decided to have a new home built for them and their family. Plaintiff Carmen Bakdaleyeh knew that her uncle, the Defendant, William Warpup, was a licensed builder, and the Plaintiffs approached Mr. Warpup to see if he could build their home. After the usual review of various architectural drawings and plans, and with the help of the Defendant, Lori Warpup, the Plaintiffs signed a contract (the "contract") on December 20, 2005. Prior to signing the contract, however, construction began on the Plaintiffs' home. Also prior to signing the contract, the Plaintiffs tendered installments totaling $26,000.00 to Mr. Warpup so he could begin construction.

The general design of payments under the contract was the traditional method of the general contractor, here Mr. Warpup, submitting documents such as sworn statements and requests for draws to a bank and title insurance company, which in turn would review these documents, check the progress of the project, and then release funds in the form of checks made payable to Mr. Warpup, Mr. Bakdaleyeh, and the third party supplier, materialmen, or laborers. For the most part, Mr. Bakdaleyeh did not endorse any of these checks. Construction continued on the Plaintiffs' home, but stopped in April, 2006, when Ms. Bakdaleyeh fell from an uncompleted step. Thereafter, Mr. Warpup claims he was terminated by the Plaintiffs, but the Plaintiffs claim that Mr. Warpup simply left the project. Regardless, the Plaintiffs sent Mr. Warpup notice that they were terminating the contract. At the time the termination letter was sent, approximately $135,000.00 was left available to complete the Plaintiffs' home.

Mr. Warpup filed various requests for payments, which were halted by the Plaintiffs. The

Plaintiffs were subsequently sued for $33,000.00 by one supplier, Church Lumber, which they ultimately settled for $25,000.00.

After Mr. Warpup left the construction project, the Plaintiffs engaged others to complete their home. Some of the work done by these contractors was for the completion of the home per the contract, but other services, such as the completion of a concrete pad for a driveway, were beyond the scope of the contract. Per the testimony of Mr. Bonaventure, the Plaintiffs' home does not have a permanent certificate of occupancy because of additional work that was needed on the exterior and interior of the home, as well as corrections to the front steps.

Carmen Bakdaleyeh testified extensively regarding the amounts expended by the Plaintiffs for the construction of their home, both with Mr. Warpup and others. As part of the discovery in this case and the state court action, Ms. Bakdaleyeh reviewed Mr. Warpup's financial records and bank accounts to determine the payments made by him to various individuals and entities connected with the Plaintiffs' construction project.

Ms. Bakdaleyeh's analysis was made more difficult by the nature of Mr. Warpup's bookkeeping. Generally, Mr. Warpup had one bank account in which he received monies for various projects and then disbursed monies from that bank account, often in the form of checks, to various suppliers, materialmen, and employees. During the time period in question, from December 2005 - April 2006, Mr. Warpup had a number of other construction projects and did not note with much particularity or specificity the origin of funds received or the disbursement of funds. Despite this, Ms. Bakdaleyeh prepared three Exhibits, 3(c), 3(d), and 3(f), that used different methods to calculate the shortfall in the amount paid by the Plaintiffs, either directly or through an intermediary, to Mr. Warpup and the disbursement of those funds by Mr. Warpup to others. Exhibit 3(c) is Ms.

Bakdaleyeh's spreadsheet reconciliation, which identifies deposits and various disbursements claimed by Mr. Warpup to be connected to the Plaintiffs' construction project, but in fact were not. Per Exhibit 3(c), there is $58,867.10 that was inappropriately applied by Mr. Warpup regarding Plaintiffs' construction project.

Exhibit 3(d) is Ms. Bakdaleyeh's reconciliation of the sworn statements supplied to the bank and title insurance company in regard to the Plaintiffs' project. Per this Exhibit, the difference between the amount that was deposited and the amount properly paid is $58,867.10, an amount identical to Exhibit 3(c).

Exhibit 3(f) is an account reconciliation of Mr. Warpup's checking account. This Exhibit attempts to analyze Mr. Warpup's bank account and determine where various funds were improperly applied. Exhibit 3(f) is incomplete to the extent that Ms. Bakdaleyeh was not able to reconcile some items identified in Mr. Warpup's bank account, a task made extremely more difficult given the withdrawals by Mr. Warpup of significant sums for personal use. Despite this, Ms. Bakdaleyeh was able to account for at least $48,318.10 as missing.

The Court finds Ms. Bakdaleyeh to be a credible witness and places more weight and credibility on Exhibits 3(c) and 3(d) because each Exhibit confirms the amount missing and is less dependent upon interpretation of information beyond the control of the parties. Exhibit 3(f) is less trustworthy because Ms. Bakdaleyeh was required to interpret incomplete information supplied by Mr. Warpup and because Mr. Warpup's records are, at best, incomplete. In this regard, the Court concludes and finds that Ms. Bakdaleyeh's analysis of Exhibits 3(c) and 3(f) is a result of Mr. Warpup's actions or inactions and not by those of Ms. Bakdaleyeh.

Ms. Bakdaleyeh testified that of the $135,000.00 that was left in available funds when the

contract was terminated, approximately $60,000.00 was needed to complete the project and another $90,000.00 - $100,000.00 was needed to repair construction defects.

Mr. Warpup testified that he admittedly did not keep good records in regard to this project and confirmed his general method of receiving and disbursing funds. Mr. Warpup also confirmed Ms. Bakdaleyeh's analysis that certain items were improperly included in draw requests or that in many cases he could not confirm that a draw request was complete and accurate. The Court finds Mr. Warpup's testimony regarding the receipt and disbursement of funds to be incomplete and inaccurate for some disbursements, such as monies paid to A&W Construction, Dan Webber, and C&L Ward.

Defendant Lori Warpup testified that she is employed with McLaren Lapeer Hospital and is responsible for the oncology and sleep therapy departments. Ms. Warpup testified that she was generally around when her niece, Ms. Bakdaleyeh, was reviewing various architectural drawings and visited the Plaintiffs' construction site from time-to-time. Ms. Warpup also testified that her employment at McLaren Lapeer Hospital is full-time and that she devotes much of her time working for McLaren Lapeer Hospital. Except for signing a few checks, no other testimony or evidence was presented linking Ms. Warpup to her husband's construction business. The Court finds Ms. Warpup to be a credible witness.

## Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157, 28 U.S.C. § 1334, and E.D. Mich. LR 83.50. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debts).

All issues before the Court arise out of Title 11 of the United States Code and do not involve issues which limit this Court's jurisdiction as raised in the cases of *Stern v. Marshall*, 131 S. Ct.

2594 (2011) and later by the Sixth Circuit Court of Appeals in *Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012).

Applicable Authorities

Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . ." The Sixth Circuit has held that § 523(a)(4) requires:

> (1) a fiduciary relationship
>         (a) in the form of an express trust or
>         (b) technical trust relationship;
> (2) breach of that fiduciary relationship; and
> (3) a resulting loss.

*R.E. America, Inc. v. Garver* (*In re Garver*), 116 F.3d 176, 178-79 (6th Cir. 1997); *see also Patel v. Shamrock Floorcovering Services, Inc.* (*In re Patel*), 565 F.3d 963 (6th Cir. 2009); *In re Johnson*, 691 F.2d 249, 251-52 (6th Cir. 1982) (finding that fiduciary capacity "applies only to express or technical trusts and does not extend to implied trusts, which are imposed on transactions by operation of law as a matter of equity" and "the requisite trust relationship must exist prior to the act creating the debt and without reference to it") (citations omitted).

The Sixth Circuit Court of Appeals has held that defalcation for purposes of § 523(a)(4) "occurs through the misappropriation [of] or failure to properly account for [ ] funds" by a fiduciary. *R.E. America, Inc. v. Garver* (*In re Garver*), 116 F.3d 176, 180 (6th Cir. 1997) (citation omitted). It requires a "pre-existing fiduciary relationship." *Patel,* 565 F.3d at 968. In *Patel*, the Sixth Circuit Court of Appeals discussed defalcation and intent in the context of the MBTFA.

> defalcation occurs when evidence supports "the objective fact that monies paid into the building contract fund were used for purposes other than to pay laborers, subcontractors or materialmen first is sufficient to constitute a defalcation under section [524](a)(4) so long as the use was not the result of mere negligence or a

6

mistake of fact." Thus, there is no such thing as "defalcation per se" and instead the debtor must have been objectively reckless in failing to properly account for or allocate funds.

*Id.* at 970 (quoting *Carlisle Cashway, Inc. v. Johnson* (*In re Johnson*), 691 F.2d 249, 257 (6th Cir. 1982)). "[T]his Circuit has never countenanced 'innocent' or merely 'negligent' defalcation" as being sufficient to find a debt non-dischargeable under § 523(a)(4). *Id.* The *Patel* court went on to find that the debtor recklessly misallocated funds, citing his testimony that he paid his own expenses, including his wages, before paying the plaintiff; the debtor's "woefully inadequate" attempts at accounting; and the debtor's concession "that his business operations were sloppy at best . . . ." *Id.* at 971.

To establish the existence of an express trust, the plaintiff "must demonstrate: (1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary." *Id.* at 968 (internal quotation marks and citation omitted). "[T]he MBTFA satisfie[s] the necessary requirement that the trust exist separate from the act of wrongdoing as a matter of federal law . . . ." *Id.* (internal quotation marks and citation omitted).

The *Johnson* court concluded that:

[t]he Building Contract Fund Act satisfies the express or technical trust requirements of section [523(a)(4)]. The trust relationship is unambiguously imposed on a contractor or subcontractor by the language of the statute. The trust res is clearly defined as the monies paid by any person into the building contract fund. The trustee is charged with specific affirmative duties, including paying out trust funds in accordance with the statutorily imposed priority scheme, not using funds for its own purposes so long as trust beneficiaries, laborers, subcontractors and materialmen remain unpaid . . . The fiduciary relationship . . . arises at the time any monies are paid to the contractor or subcontractor whether or not there are any beneficiaries of the trust at that time and continues until all of the trust beneficiaries have been paid.

*Id.* at 252-53.

Therefore, the first element of § 523(a)(4), a fiduciary relationship, is met for funds held

7

under the MBTFA. *See also Patel,* 565 F.3d at 963.

After the plaintiff establishes a breach of the fiduciary duty, "the plaintiff must demonstrate a loss resulting from the breach." *Sangal v. Strickfaden* (*In re Strickfaden*), No. 09-CV-15060, 2010 WL 3583427, at *4 (E.D. Mich. Sept. 9, 2010) (noting there is no defalcation if the funds were spent completing the project or toward contract-related bills).

Once the plaintiff has established the existence of a trust and that the defendant is a trustee, the burden of proof shifts to the defendant. In *Cappella v. Little* (*In re Little*), 163 B.R. 497 (Bankr. E.D. Mich. 1994), Judge Spector found that the question of burden of proof for defalcation while acting in a fiduciary capacity was a substantive question, and thus should be determined under state law. *Id.* at 502. In reviewing Michigan law, Judge Spector found that:

> Michigan courts have repeatedly stated in various contexts that a trustee must account to the beneficiaries for the disposition of trust funds. . . . Failure to properly so account is, by definition, a defalcation.
>
> It has been stated that the beneficiary has the initial burden of proving the existence of a fiduciary duty and the trustee's failure to perform it . . . [T]he burden then shifts to the trustee . . . to prove it acted with . . . good faith . . . and made full disclosure of all facts related to the transactions at issue. . . . [T]he mere failure to account establishes a loss.
>
> Since trustees have a duty to account under Michigan law, it is only logical that the Debtor, a statutory trustee, must prove that no defalcation occurred – i.e., that he be required to account for the trust funds he received. . . . [T]he Michigan Supreme Court has stated that where a trustee is called upon in a court of equity to account for the funds received by him as trustee, . . . the duty rests upon him to so account, and the burden of proof is upon him to establish the correctness of the account.

*Id.* at 500-01 (internal quotation marks and citations omitted).

Courts also must establish the amount excepted from discharge. Often this determination is fact intensive and sensitive. For example, in *Kriegish v. Lipan* (*In re Kriegish*), 275 B.R. 838,

841-42, 845 (E.D. Mich. 2002), the debtor/contractor was able to account for some, but not all, of the funds received. The bankruptcy court applied its equitable powers to determine the allocation factor that approximated the amount of funds misspent; Also in *In re Little*, 163 B.R. at 504 n.7, the Court noted that "[a]s a general rule, the debtor is barred by collateral estoppel from relitigating the amount of a debt alleged to be nondischargeable" but there may be exceptions if "it is possible that all or some portion of the debt as determined by the state court may simply reflect the cost to the Plaintiff of completing the project, rather than defalcation by the Debtor").

Analysis

I. The Plaintiffs' claims against the Defendant, Lori Warpup

The Plaintiffs claim that any obligation owed to them by the Defendant, Lori Warpup, should be excepted from discharge under 11 U.S.C. § 524(a)(4). The Plaintiffs claim that Ms. Warpup was involved in her husband's construction business such that she should be held accountable as a fiduciary. The Plaintiffs rely upon Ms. Warpup's participation during the pre-planning stages of the construction project and the fact that she signed three to four checks out of the account held by Mr. Warpup. Moreover, the Plaintiffs claim that Ms. Warpup received benefits from Mr. Warpup's actions.

The Court disagrees with the Plaintiffs' contentions. The evidence and testimony do not support a finding that Ms. Warpup was involved in her husband's construction business. Instead, she is active as a full-time employee for McLaren Lapeer Hospital in two areas that require intensive management. Moreover, there is no evidence that Ms. Warpup has any specialized knowledge in the construction business, and her participation, at best, was more in line with her relationship as an aunt to the Plaintiff, Carmen Bakdaleyeh. The limited number of checks signed by Ms. Warpup are

9

not sufficiently connected to the Plaintiffs' case or to the construction project undertaken by Mr. Warpup on behalf of the Plaintiffs. With this record, the Court finds that the Plaintiffs have not proven a cause of action against the Defendant, Lori Warpup, and the Court holds that any obligation owed by the Defendant, Lori Warpup, to the Plaintiffs, Carmen and Mohammad Bakdaleyeh, is discharged.

## II. The Plaintiffs' claims against the Defendant, William Warpup

The Defendant, William Warpup, is a licensed builder and he entered into a construction contract with the Plaintiffs to build a home for them. It is undisputed that the Plaintiffs paid Mr. Warpup at least $26,000.00 directly and that Mr. Warpup received funds on their behalf from their bank, all for the purpose of completing the construction of their home. It is also undisputed that there were a number of suppliers and materialmen that were left unpaid when the contract was terminated and that additional work needed to be done to complete the Plaintiffs' home. Moreover, Mr. Warpup testified that his books were not well kept, and as his attorney argued in closing argument, Mr. Warpup was a poor bookkeeper.

With this record, the Court concludes that Mr. Warpup was a trustee under the MBTFA and 11 U.S.C. § 523(a)(4) and, as such, certain duties were imposed on him, which he breached. The evidence before the Court and the testimony of Ms. Bakdaleyeh establishes that Mr. Warpup misapplied monies received by him in that he paid other materialmen and suppliers for projects other than the Plaintiffs' building project and he received monies to pay his own personal expenses out of the one common checking account maintained by him in his business. The Court therefore finds and concludes that Mr. Warpup has breached his duties under the MBTFA and that the Plaintiffs, by incurring costs to pay materialmen and suppliers that should have been paid by Mr. Warpup and

by incurring additional expenses to complete their home, have suffered a loss.

The Court now turns to the issue of the loss and the amount of damages suffered by the Plaintiffs. In this case, the books and records of Mr. Warpup are such that these damages cannot be calculated with complete certainty. What is known is that the Plaintiffs have incurred significant additional costs to finish portions of their home and that more costs will be incurred to correct the exterior and interior defects in their home and to correct the front porch.

The Court finds Ms. Bakdaleyeh's calcuations and Exhibits 3(c) and 3(d) compelling and credible. Through two separate analyses, Ms. Bakdaleyeh has determined that at least $58,867.10 has been misappropriated by Mr. Warpup. The Plaintiffs argue that additional monies may have been misappropriated and seek to recover the additional costs they will incur to repair their home so that they can receive a permanent certificate of occupancy. The Court recognizes these arguments, but also notes that some of the monies available to the Plaintiffs were expended for items not included in the original construction contract. For example, the approximate 2,900 square feet of concrete appears to be an additional item not included in the construction contract that was paid for by monies available from the Plaintiffs' construction loan. While the Court notes that the Plaintiffs undoubtedly did incur additional expenses, the most certain number supplied to the Court is the $58,867.10 in Exhibits 3(c) and 3(d).

On the other hand, Mr. Warpup argues that the Plaintiffs misspent the remaining monies available to them and that had he been allowed to remain on the project he could have completed the project without spending any more than the remaining $135,000.00 left available from the construction loan. While acknowledging that this may be a possibility, the Court rejects Mr. Warpup's arguments as being speculative. First, the books and records of Mr. Warpup are in such

11

disarray that the Court cannot see how Mr. Warpup could complete the remainder of this project for the remaining $135,000.00. If Mr. Warpup had the opportunity to complete the Plaintiffs' construction project, the Court finds it is just as likely as not that Mr. Warpup would have utilized funds from other projects, much as he did in the Plaintiffs' project, to complete the Plaintiffs' construction project. Second, it is uncontroverted that Mr. Warpup used funds received from the Plaintiffs to fund personal expenses, that materialmen and suppliers were left unpaid, and that there was a substantial remaining amount of work to be completed. Finally, Mr. Warpup offers no specific course of action that he intended to follow in the spring of 2006 to complete the Plaintiffs' project.

As it is Mr. Warpup's burden of proof to show where the money he received was applied and because the Plaintiffs have shown with specificity through Exhibits 3(c) and 3(d), as well as part of Exhibit 3(f), that funds were misappropriated and misapplied, the Court finds and concludes that the Defendant, William Warpup, did not meet his burden of proof as to the receipt and disbursement of the funds or as to his explanation of the remaining work that needed to be completed with the remaining funds available. Alternatively, the Court finds and concludes that the Plaintiffs, Carmen and Mohammad Bakdaleyeh, did provide the Court with sufficient evidence in the form of Ms. Bakdaleyeh's testimony and evidence, specifically, Exhibits 3(c) and 3(d), as well as portions of Exhibit 3(f), to meet their initial burden of proof and to address any issues that the Defendant, William Warpup, raised that needed further explanation from the Plaintiffs.

## Conclusion

For the reasons stated in this Opinion, the Court concludes that the Plaintiffs have failed to state a cause of action against the Defendant, Lori Warpup. The Court concludes that the Plaintiffs

have met their burden of proof that the amount of $58,867.10 is excepted from discharge pursuant to 11 U.S.C. § 523(a)(4) and that the Defendant, William Warpup, has failed to satisfactorily explain the disbursement of funds received by him.  Accordingly, counsel for the Plaintiffs is directed to prepare an Order consistent with this Opinion and with the presentment of order rules of this Court.

cc:     John Monnich

Not for Publication.

**Signed on October 08, 2013**

                                      **/s/ Daniel S. Opperman**
                                      **Daniel S. Opperman**
                                      **United States Bankruptcy Judge**

13

11-03041-dof    Doc 91    Filed 10/08/13    Entered 10/08/13 11:08:04    Page 13 of 13